Filed 5/13/21; Opinion on transfer from Supreme Court

## CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STAND UP FOR CALIFORNIA! et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> STATE OF CALIFORNIA et al., <br><br> Defendants and Respondents; <br><br> NORTH FORK RANCHERIA OF MONO INDIANS, <br><br> Intervener and Respondent. | F069302 <br><br> (Super. Ct. No. MCV062850) <br><br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Madera County. Michael J. Jurkovich, Judge.

Snell & Wilmer, Sean M. Sherlock, Todd E. Lundell, and Jing Hua, for Plaintiffs and Appellants.

Xavier Becerra, Attorney General, Sara J. Drake, William P. Torngren, and Timothy M. Muscat, Deputy Attorneys General, for Defendants and Respondents.

Maier Pfeffer Kim Geary & Cohen, John A. Maier; Wilmer Cutler Pickering Hale and Dorr, Danielle Spinelli and Christopher E. Babbitt, for Intervener and Respondent.

-ooOoo-

Plaintiffs Stand Up for California! and Barbara Leach (plaintiffs) brought this lawsuit to challenge the Governor's authority to concur in the decision of the United States Secretary of the Interior (Interior Secretary) to take 305 acres of land in Madera County into trust for North Fork Rancheria of Mono Indians (North Fork) for the purpose of operating a casino. The trial court sustained demurrers by North Fork and the state defendants— the State of California, the Governor, the Attorney General, the California Gambling Control Commission, and the Bureau of Gambling Control. In 2016, we reversed the judgment of dismissal, concluding the Governor lacked the authority to concur in the Interior Secretary's determination to take the Madera site into trust. (*Stand Up for California! v. State of California* (2016) 6 Cal.App.5th 686, 705.) The California Supreme Court granted review and held this case pending its decision in *United Auburn Indian Community of Auburn Rancheria v. Newsom* (2020) 10 Cal.5th 538 (*United Auburn*).

After deciding California law empowers the Governor to concur, the Supreme Court transferred this case back to us with directions to vacate our decision and reconsider the matter in light of *United Auburn*. We conclude the facts of this case are distinguishable from those in *United Auburn* because at the November 2014 general election California voters rejected the Legislature's ratification of the tribal-state compact for gaming at the Madera site. As described below, we conclude the people retained the power to annul a concurrence by the Governor and the voters exercised this retained power at the 2014 election by impliedly revoking the concurrence for the Madera site. As a result, the concurrence is no longer valid, and the demurrer should have been overruled.

We therefore reverse the judgment of dismissal.

2.

## FACTS AND PROCEDURAL HISTORY

*Federal Statutes*

The history of federal and state regulation of gaming on Indian lands is set forth in *United Auburn* and need not be repeated in detail here. (See *United Auburn*, *supra*, 10 Cal.5th at pp. 544-547.) Two federal statutes relevant to this litigation are the Indian Reorganization Act of 1934 (IRA; 25 U.S.C. § 5101 et seq.) and the Indian Gaming Regulatory Act (IGRA; 18 U.S.C. §§ 1166-1167; 25 U.S.C. § 2701 et seq.). IRA authorizes the Interior Secretary to acquire land and hold it in trust to provide land for Indians. (*Carcieri v. Salazar* (2009) 555 U.S. 379, 381-382; 25 U.S.C. § 5108.) IGRA provides "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." (25 U.S.C. § 2702(1).) Class III gaming—the type of gambling practiced in casinos in Nevada (25 U.S.C. § 2703(6)-(8))—is lawful on Indian lands when certain statutory conditions have been met. (See 25 U.S.C. § 2710(d).) Additional conditions apply when, like the 305 acres in Madera County, the land was taken into trust after October 17, 1988. (See 25 U.S.C. § 2719; 25 C.F.R. § 292 (2008) ["Gaming on Trust Lands Acquired After October 17, 1988"].) One of those conditions—the Governor's concurrence—is the subject of this litigation.

The statutory text imposing this condition provides that land taken into trust after October 17, 1988, may be used for gaming if "the [Interior] Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, *but only if the Governor of the State in which the gaming activity is to be conducted concurs in the [Interior] Secretary's determination*." (25 U.S.C. § 2719(b)(1)(A), italics added.) For purposes of this opinion,

3.

we refer to the Interior Secretary's determination under this IGRA provision as the two-part determination. IGRA does not grant the Governor the authority to concur—that authority must come from state law. (*United Auburn*, *supra*, 10 Cal.5th at pp. 548-549, fn. 4.)

*North Fork's Proposed Casino*

North Fork is a federally recognized Indian tribe with about 1,900 tribal citizens. It possesses a small rancheria in the Sierra Nevada foothills near the unincorporated community of North Fork. In March 2005, North Fork submitted a formal fee-to-trust application to the Bureau of Indian Affairs, requesting the United States Department of the Interior (DOI) take into trust for North Fork's benefit a 305-acre parcel in Madera County. The parcel is located on State Route 99 adjacent to the City of Madera, about 40 miles west of the rancheria. North Fork proposes building a hotel and casino with class III gaming on the site.

At the time of the fee-to-trust application, the parcel was owned by a subsidiary of North Fork's development partner. That entity, Nevada-based Station Casinos, LLC, is partially owned by Red Rock Resorts, Inc., a publicly traded company. Plaintiffs alleged North Fork and Station Casinos signed a casino management contract that gives Station Casinos the right to operate the casino and receive 24 percent of its net income.

In September 2011, the Interior Secretary made a two-part determination on North Fork's proposed casino, finding that taking the land into trust for the purpose of gaming would be in the best interest of North Fork and would not be detrimental to the surrounding community. (25 U.S.C. § 2719(b)(1)(A).) By letter dated August 30, 2012, the Governor concurred in the Interior Secretary's two-part determination. The Governor's letter expressed a reluctance to allow the expansion of gaming on land currently ineligible for it, but concurred "in this case because of several exceptional

4.

circumstances." The Governor's concurrence fulfilled a condition set forth in IGRA. (25 U.S.C. § 2719(b)(1)(A).)

In November 2012, the Interior Secretary, having made his two-part determination and obtained the Governor's concurrence, issued a decision approving North Fork's fee-to-trust application for the 305-acre parcel. This decision was implemented in February 2013, when a grant deed conveying the 305 acres to the federal government in trust was executed by North Fork's development partner, accepted by the Interior Secretary, and recorded in the County of Madera.[1]

While the Governor was evaluating whether to concur in the Interior Secretary's two-part determination, he and North Fork negotiated a tribal-state compact under Government Code section 12012.25 and article IV, section 19, subdivision (f), of the California Constitution. Under IGRA, a tribal-state compact is one of the methods of legalizing class III gaming on Indian land. (25 U.S.C. § 2710(d)(1)(C).) Such compacts address many issues, including the scope of the games, standards for operating the games, regulatory responsibility, allocation of criminal and civil jurisdiction, liquor sales, and taxes on retail and restaurant outlets. (25 U.S.C. § 2710(d)(3)(C).)

The tribal-state compact negotiated by the Governor and North Fork authorized North Fork to conduct class III gaming on the 305-acre parcel. In exchange, North Fork agreed not to conduct gaming on its environmentally sensitive rancheria or elsewhere in California; agreed to make payments to the Chukchansi Tribe to mitigate the economic impact of the new casino on the existing Chukchansi casino; agreed to share revenue with

---

[1] The validity of this fee-to-trust decision was challenged in a federal lawsuit. (See *Stand Up for California! v. U.S. Dept. of the Interior* (D.D.C. 2016) 204 F.Supp.3d 212, affirmed 879 F.3d 1177.) The District of Columbia Circuit concluded the decision to take the land into trust for North Fork "was reasonable and consistent with applicable law" and affirmed the district court's grant of summary judgment in favor of DOI. (*Stand Up for California! v. U.S. Dept. of the Interior* (D.C. Cir. 2018) 879 F.3d 1177, 1192.)

the Wiyot Tribe in order to enable that tribe to forgo gaming on its environmentally sensitive land near Humboldt Bay National Wildlife Refuge; agreed to participate in a revenue-sharing scheme to benefit other tribes without casinos; and submitted to detailed regulations for the operation of its casino.

The Governor and North Fork executed the compact on August 31, 2012, the day after the Governor signed his concurrence letter. Under California's Constitution, such compacts are "subject to ratification by the Legislature." (Cal. Const., art. IV, § 19, subd. (f).) Accordingly, the Governor forwarded the compact to the Legislature for its approval.

*This Lawsuit*

In March 2013, plaintiffs filed a complaint alleging the Governor violated the California Constitution when he concurred in the Interior Secretary's two-part determination. As amended, the complaint named as defendants the State of California, the Governor, the Attorney General, the Gambling Control Commission, and the Bureau of Gambling Control. The complaint alleged the Governor had no authority to concur and prayed for a writ of mandate setting aside the concurrence.

While the lawsuit was pending, both houses of the Legislature passed Assembly Bill No. 277, which added section 12012.59 to the Government Code. Subdivision (a)(1) of the new section stated: "The tribal-state gaming compact entered into in accordance with the federal Indian Gaming Regulatory Act [citations] between the State of California and the North Fork Rancheria Band of Mono Indians, executed on August 31, 2012, is hereby ratified." Subdivision (b) of the new section provided that, in deference to tribal sovereignty, certain actions were not subject to the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.). The Governor signed it on July 3, 2013, and it became chapter 51 of the Statutes of 2013. The ratified compact was forwarded to the Interior Secretary, who published a notice in the Federal Register, stating that the

6.

compact was approved and was taking effect to the extent it was consistent with IGRA. (78 Fed.Reg. 62649 (Oct. 22, 2013).)

In July 2013, Cheryl Schmit, using the letterhead of Stand Up for California!, asked the Attorney General for a title and summary for a proposed statewide referendum rejecting the compact ratification statute, chapter 51 of the Statutes of 2013.  The Attorney General issued an official title and summary for the measure that stated:

> "**REFERENDUM TO OVERTURN INDIAN GAMING COMPACTS.** If signed by the required number of registered voters and timely filed with the Secretary of State, this petition will place on the statewide ballot a challenge to a state law previously approved by the Legislature and the Governor.  The law must then be approved by a majority of voters at the next statewide election to go into effect.  The law ratifies two gaming compacts (with the North Fork Rancheria of Mono Indians, and the Wiyot Tribe); and it exempts execution of the compacts, certain projects, and intergovernmental agreements from the California Environmental Quality Act.  (13-0007.)"

The proponents of the petition had until October 1, 2013, to submit voter signatures in support of the petition to county election officials.

In August 2013, North Fork, which was not originally a party to the litigation initiated by plaintiffs' complaint, was granted leave to intervene.  North Fork filed a cross-complaint, seeking a declaratory judgment stating the referendum petition was invalid.  The cross-complaint and its subsequent dismissal are not material to the resolution of this appeal.

North Fork and the state defendants demurred to plaintiffs' complaint, which alleged the Governor's concurrence was unauthorized.  In March 2014, the trial court sustained the demurrers.  In its written ruling, the court stated that the Governor's power to concur arose by implication from his authority to negotiate and execute tribal-state compacts, as set forth in article IV, section 19, subdivision (f), of the California Constitution.  Because the Governor was authorized to negotiate compacts for gaming on Indian land, and some such compacts, including the one at issue in this case, cannot come

7.

into effect unless the land in question is taken into trust by the federal government with the Governor's concurrence, the Governor must have the power to concur. The court rejected plaintiffs' argument that when the voters added article IV, section 19, subdivision (f), to the California Constitution via Proposition 1A in 2000, they intended to deny to the state the authority to approve Indian casinos on land that was not Indian land at the time, so that there could be no casinos on newly added trust land. Plaintiffs conceded they could not cure their complaint by amendment, so the demurrers were sustained without leave to amend. A defense judgment was entered on March 12, 2014. Plaintiffs timely appealed.

*Proposition 48*

While this appeal was pending, the proponents of the referendum on the statute ratifying the compacts obtained a sufficient number of valid petition signatures to qualify the referendum for the November 4, 2014 general election ballot. The measure was designated Proposition 48 and submitted to the electorate. At the election, approximately 4.2 million Californians (61 percent) voted "No" on Proposition 48, thereby rejecting the ratification statute. (Historical and Statutory Notes, 32E pt. 1 West's Ann. Gov. Code (2016 supp.) foll. § 12012.59, p. 13.)

*Federal Litigation*

As a result of the voters' rejection of the tribal-state compact, the state refused to negotiate another compact with North Fork. In March 2015, North Fork filed an action in the United States District Court for the Eastern District of California to compel the state to negotiate a new compact in good faith. (*Stand Up for California! v. U.S. Dept. of the Interior* (E.D.Cal. 2018) 328 F.Supp.3d 1051, 1056, affd. in part & revd. in part (9th Cir. 2020) 959 F.3d 1154.) In November 2015, the district court granted North Fork's request and ordered North Fork and the state to conclude a compact within 60 days. (*Id*. at p. 1057.) Pursuant to IGRA, the district court then sent the matter to mediation, which did

8.

not produce a settlement. (*Ibid.*) In July 2016, the Interior Secretary approved a document called Secretarial Procedures for the North Fork Rancheria of Mono Indians (the secretarial procedures) for the purpose of authorizing class III gaming on the 305-acre site in the absence of a state-approved compact. (*Ibid.*) The secretarial procedures, which are 102 pages long (excluding the table of contents and appendices), contain detailed provisions governing how the gaming will be conducted and many other issues. A DOI letter dated July 29, 2016, notified North Fork that the secretarial procedures were in effect.

In November 2016, Stand Up for California! and others filed another lawsuit against DOI in the United States District Court for the Eastern District of California to challenge the secretarial procedures. (*Stand Up for California! v. U.S. Dept. of the Interior*, *supra*, 959 F.3d at pp. 1157-1158.) The district court granted the DOI's motion for summary judgment. (*Id.* at p. 1158.) In May 2020, the Ninth Circuit determined the secretarial procedures complied with the federal Administrative Procedure Act. (*Stand Up for California! v. U.S. Dept. of the Interior*, *supra*, at pp. 1156-1157, 1162.) However, the court remanded the case for further proceedings to determine whether the issuance of the secretarial procedures complied with federal environmental statutes. (*Id.* at p. 1166.)

*This Appeal*

In December 2016, this court issued an opinion concluding that, in the circumstances presented, the Governor lacked the authority to concur in the Interior Secretary's two-part determination. (*Stand Up for California! v. State of California*, *supra*, 6 Cal.App.5th at p. 705.) Each member of the panel adopted a different rationale to reach this conclusion.

The state and North Fork filed petitions for review. In March 2017, the California Supreme Court granted the petitions and deferred consideration pending the outcome of *United Auburn*.

On August 31, 2020, the California Supreme Court filed its decision in *United Auburn*, concluding "that California law empowers the Governor to concur." (*United Auburn*, *supra*, 10 Cal.5th at p. 543.) A month and a half later, the Supreme Court transferred the present case back to this court "with directions to vacate its decision and reconsider the matter in light of *United Auburn v. Newsom* (2020) 10 Cal.5th 538. (Cal. Rules of Court, rule 8.528(d).)" In accordance with these directions and the California Rules of Court, we allowed all parties to submit an opening brief followed by a brief addressing the points raised by their opponents.

## DISCUSSION

### I.    *United Auburn*

Pursuant to the Supreme Court's transfer order, our task is to determine whether the Governor's concurrence in the Interior Secretary's two-part determination for the Madera site is valid. We start by describing the holding in *United Auburn* and the analysis the high court used to define the Governor's concurrence power.

The Supreme Court held "that current California law permits the Governor's concurrence in the Interior Secretary's determination to allow class III gaming on Indian land taken into trust for an Indian tribe after IGRA was enacted." (*United Auburn*, *supra*, 10 Cal.5th at p. 564.) The concurrence upheld in *United Auburn* was set forth in a letter from the Governor dated August 30, 2012. (*Id*. at p. 547.) That date has significance in this case because the Governor's concurrence letter addressing the Madera site also was dated August 30, 2012.

The Supreme Court stated its conclusion about the Governor's concurrence authority was "supported by the Governor's historical practice of concurring under a

10.

variety of federal statutes, the legislatively enacted expectation that the Governor represent the state's interests in negotiations or proceedings involving the federal government, and the absence of any explicit constitutional or statutory limits on the Governor's power to concur in the Interior Secretary's determination under IGRA." (*United Auburn*, *supra*, 10 Cal.5th at p. 544.) The court described the foregoing as "markers of the legal terrain [that] help us map a zone of twilight between the powers of the Governor and the Legislature. But they also convey why legislative changes can, by bringing any implicit gubernatorial power to 'its lowest ebb' in this domain, restrict or eliminate the Governor's concurrence power. (*Youngstown Co. v. Sawyer* (1952) 343 U.S. 579, 637 (conc. opn. of Jackson, J.) (*Youngstown*).) Because the Legislature has imposed no such restriction, however, we conclude the Governor acted lawfully when he concurred in the Interior Secretary's determination" relating to proposal for the Enterprise Rancheria of Maidu Indians. (*United Auburn*, *supra*, 10 Cal.5th at p. 544.)

The Supreme Court discussed the relationship of Proposition 1A to the Governor's implicit power to concur. Proposition 1A added article IV, section 19, subdivision (f), to the California Constitution, which states in full:

> "Notwithstanding subdivisions (a) and (e), and any other provision of state law, the Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law. Accordingly, slot machines, lottery games, and banking and percentage card games are hereby permitted to be conducted and operated on tribal lands subject to those compacts."

The Supreme Court noted the parties' agreement that Proposition 1A provided the starting point for an analysis of the concurrence power. (*United Auburn*, *supra*, 10 Cal.5th at p. 550.) Addressing the text of Proposition 1A, the court stated it did not expressly grant the Governor the power to concur. (*Ibid*.) The court also considered the reference to federal law and concluded it "does not, by itself, bestow the Governor with

11.

the concurrence power." (*Ibid.*)  Next, the court concluded the absence of an express grant of concurrence authority did not resolve the question because "each branch of government possess certain inherent or implied powers." (*Id.* at p. 551.)  Consequently, the remainder of the court's discussion addressed whether the Governor's concurrence was an implicit power.

Proposition 1A expressly authorized the Governor to negotiate and conclude tribal-state compacts for gaming on Indian lands.  Accordingly, the Supreme Court considered whether the express grant of authority to enter compacts impliedly granted the authority to concur.  (*United Auburn*, *supra*, 10 Cal.5th at p. 554.)  The court concluded the power to negotiate compacts did not, by itself, imply the grant of an implied power to concur.  (*Ibid.*)  Nonetheless, the court determined the power to negotiate compacts was "consistent with the Governor exercising his inherent power to concur to allow class III gaming on" land taken into trust after IGRA was enacted.  (*Ibid.*)

The Supreme Court examined the ballot materials for Proposition 1A, discussed inferences that could be drawn from those materials, and found no reason to conclude the Governor was barred from concurring in the Interior Secretary's two-part determination. (*United Auburn*, *supra*, 10 Cal.5th at p. 556.)  Those materials do not address the specific questions of law raised in this appeal.

The court also addressed how separation of power concerns affected the Governor's power to concur and included a historical analysis of the power to concur in other contexts.  (*United Auburn*, *supra*, 10 Cal.5th at pp. 558-563.)  Ultimately, the court concluded the Governor had the authority to concur and stated the concurrence authority was "consistent with his historic practice of concurring in a variety of cooperative-federalism schemes, and his role as the state's representative under Government Code section 12012." (*Id.* at p. 563.)  As a result, the court found "it consistent with Proposition 1A and our separations of powers jurisprudence to conclude that, despite the

12.

absence of specific legislative authorization, California law empowers the Governor to concur." (*Ibid*.)

The last step of our overview of *United Auburn* describes some of the limitations on the Governor's implicit power to concur in the Interior Secretary's two-part determination. The court stated the power to concur falls within a " 'zone of twilight' … where legislative 'inertia, indifference or quiescence' invites the exercise of executive power." (*United Auburn*, *supra*, 10 Cal.5th at p. 563.) The court stated the Governor's implicit concurrence power "isn't an indefeasible one" and the legislative branch may enact legislation reducing that power. (*Ibid*.) Specifically, "the Legislature may restrict or eliminate the Governor's implicit power to concur." (*Id*. at p. 564.) The court determined there was no state law creating such a limitation and, thus, the Governor had the power to concur in the Interior Secretary's two-part determination in that case. (*Ibid*.)

## II. *Role of Proposition 48*

### A. Contentions

Plaintiffs contend the Governor's concurrence for the Madera site is invalid under the unique facts of this case. They argue the Governor's inherent or implied power to concur is not an indefeasible one and exists in a "zone of twilight" that is dependent upon legislative inaction. Plaintiffs assert no such inaction exists because voters exercised their legislative function in rejecting Proposition 48, the referendum seeking ratification of a tribal-state compact for North Fork's proposed casino. Based on the outcome of the referendum, plaintiffs contend this case is easily distinguished from *United Auburn* because the state's legislative apparatus was not indifferent to and did not acquiesce in the Governor's exercise of an authority to concur in the proposed class III gaming at the Madera site.

The state contends the ratification or rejection of the tribal-state compact is irrelevant because the Governor's concurrence power does not depend upon a valid

13.

compact. Under the state's interpretation of Proposition 48, it addressed only the compact. It did not address the Governor's previous concurrence in the Interior Secretary's two-part determination for the Madera site or, more generally, the Governor's authority to concur. Thus, in the state's view, Proposition 48 cannot be interpreted as negating the Governor's exercise of the concurrence authority he clearly held on August 30, 2012. Summarizing its position, the state asserts: "No law limits the Governor's power to concur, and Proposition 48 did not create any such law."

North Fork contends the rationale that the Governor's implied power does not survive in a case where the voters have vetoed an exercise of the express power on which the implied power is based did not survive *United Auburn* because Proposition 48 was not a legislative action limiting the Governor's concurrence authority. North Fork argues there are multiple reasons why Proposition 48 cannot be treated as an implicit, retroactive restriction on the Governor's concurrence authority. North Fork starts with the Supreme Court's conclusion that "current California law permits the Governor's concurrence" (*United Auburn*, *supra*, 10 Cal.5th at p. 564) and its statement that "the Legislature has imposed no … restriction" on the Governor's authority. (*Id*. at p. 544.) Next, North Fork argues Proposition 48 was not enacted by the Legislature, implying that only the Legislature, not the voters, has the ability to impose a restriction on the Governor's authority. North Fork also joins the state's textual argument and asserts Proposition 48 did not pertain to the concurrence authority and, thus, did not purport to restrict it. North Fork argues a voter referendum addressing a distinct, legislative act cannot impliedly, and retroactively, divest the Governor of the concurrence power the Supreme Court held he possesses.

14.

B.      The People's Authority to Invalidate a Concurrence

The parties' contentions raise a series of questions about the authority of the people to eliminate or invalidate a concurrence given by the Governor. *United Auburn* did not resolve these questions of constitutional law.

1.      *Retroactive Annulment*

The first question is whether the Governor's concurrence, once given, can be invalidated by subsequent action of the electorate. This question has a dual aspect involving the people's authority and the timing of the exercise of that authority. North Fork described the timing aspect as "the troublesome retroactivity question." North Fork did not explicitly address the aspect of the question involving the people's authority. However, its argument that *United Auburn* envisioned an affirmative act by the Legislature to prospectively limit the Governor's authority implies the people lack the authority to invalidate a concurrence already given.

The facts presented in *United Auburn* did not raise the question of the authority of the Legislature or the people to annul a concurrence given by the Governor. As a result, the Supreme Court did not decide the question or discuss it in dicta. (See *Masellis v. Law Office of Leslie F. Jensen* (2020) 50 Cal.App.5th 1077, 1093 [our high court's dicta usually are followed unless there is a compelling reason not to do so].) In particular, the court did not state a concurrence issued by the Governor could *never* be revoked or annulled by either the Legislature or California's voters or, alternatively, a Governor's concurrence was *always* subject to revocation or annulment by the Legislature or the people. Similarly, the court did not address a middle ground and identify the circumstances in which the Legislature or the people could, or could not, revoke a concurrence given by the Governor.

In the absence of express guidance from the Supreme Court, we turn to the California Constitution, which "is the fundamental and supreme law of this state as to all matters within its scope." (*Dye v. Council of City of Compton* (1947) 80 Cal.App.2d 486,

15.

490 (*Dye*).)  The foundation of our state government is the principle that "[a]ll political power is inherent in the people.  Government is instituted for their protection, security, and benefit, and they have the right to alter or reform it when the public good may require."  (Cal. Const., art. II, §1; see *McClatchy Newspapers v. Superior Court* (1988) 44 Cal.3d 1162, 1184 [our Constitution recognizes that in our democratic system all political power derives from the people].)  The court in *Dye* provided an explanation of the constitutional term "political power" by stating "all governmental power, legislative or otherwise, is derived from the people."  (*Dye*, *supra*, at pp. 489-490.)  Another constitutional provision defines the Governor's authority:  "The supreme executive power of this State is vested in the Governor.  The Governor shall see that the law is faithfully executed."  (Cal. Const., art. V, § 1.)  The relationship between the people and the Governor is defined in part by the people's express authority to recall elective officers such as the Governor.  (Cal. Const., art. II, §§ 13, 14.)  Thus, under the California Constitution, the Governor is not an independent co-equal of the people.  Any power the Governor possesses is derived from them.

These constitutional provisions are general in nature and do not provide a specific answer to the question of whether a concurrence, once given, can be revoked or annulled by the people.  Consequently, with these constitutional principles in mind, we return to *United Auburn* and its description of the scope and nature of the Governor's implicit power to concur in the Interior Secretary's two-part determination.  As quoted earlier, the Supreme Court stated legislative changes could restrict or eliminate the Governor's concurrence power.  (*United Auburn*, *supra*, 10 Cal.5th at p. 544.)  The court also stated the concurrence power "isn't an indefeasible one."  (*Id.* at p. 563.)  The court did not define what it meant by "indefeasible."  As a result, we conclude the court used the word "indefeasible" in its ordinary sense, rather than in an undisclosed, technical sense.  "[T]o ascertain the ordinary, usual meaning of a word, courts appropriately refer to the

16.

dictionary definition of that word." (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121-1122.)

The adjective "defeasible" means "capable of being or liable to being voided, annulled, or undone **:** subject to defeasance esp. by being cut off through the exercise of a power or the happening of an event." (Webster's 3d New Internat. Dict. (1993) p. 590.) The noun "defeasance" means defeat, overthrow, undoing or "rendering null or void." (*Ibid.*) Accordingly, the adjective "indefeasible" is defined as "not capable of or not liable to being annulled or voided or undone." (*Id*. at p. 1147.) These terms have the same meanings when used in a legal context. Black's Law Dictionary (8th ed. 2004) defines "defeasible" as "capable of being annulled or avoided" and "indefeasible" as "not vulnerable to being defeated, revoked, or lost." (*Id*. at pp. 449, 783.)

Based on section 1 of article II of the California Constitution, our Supreme Court's description of the concurrence power as defeasible, and its use of the "zone of twilight" metaphor (*United Auburn*, *supra*, 10 Cal.5th at pp. 544, 563), we conclude the people of California retained the authority to annul a concurrence in the Interior Secretary's two-part determination after it has been issued by the Governor. In other words, the Governor's exercise of the defeasible concurrence power is itself an act capable of being avoided or undone by the people. No party has presented a different interpretation of section 1 of article II of the California Constitution.

### 2. *How the Authority to Annul is Exercised*

The second legal question addresses the proper mechanism for the people's exercise of their power to annul a Governor's concurrence after it is given. Proposition 48 was a referendum, not an initiative, and, therefore, the question considered here is limited to whether the people's authority to revoke a concurrence may be exercised by referendum. We regard this legal question as separate from the question of whether the

17.

particular referendum in this case, Proposition 48, actually exercised that authority and annulled the Governor's August 30, 2012 concurrence for the Madera site.

North Fork argues legislation is required to limit the concurrence power, a referendum does not enact legislation, and, therefore, Proposition 48 cannot be viewed as legislation annulling the Governor's concurrence. The state also addresses whether a referendum is an appropriate mechanism for revoking a concurrence. The state argues the electorate's referendum power is limited to acts that are legislative in nature and the Governor's concurrence power is an executive power that is not subject to referendum.

Referendum are addressed in article IV, section 1 of the California Constitution, which provides in full: "The legislative power of this State is vested in the California Legislature which consists of the Senate and Assembly, but the people reserve to themselves the powers of initiative and referendum." Article II, section 9, subdivision (a) provides: "The referendum is the power of the electors to approve or reject statutes or parts of statutes" subject to certain exceptions inapplicable in this appeal.

California courts routinely recognize their duty to jealously guard the right of the people to the initiative and referendum. (E.g., *Wilde v. City of Dunsmuir* (2020) 9 Cal.5th 1105, 1125; *Martin v. Smith* (1959) 176 Cal.App.2d 115, 117.) " 'If doubts can reasonably be resolved in favor of the use of this reserve power, court will preserve it.' " (*Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 591.) Courts have implemented this principle by adopting a general rule requiring referendum provision be liberally construed to uphold the power. (*Ibid.*; *Rossi v. Brown* (1995) 9 Cal.4th 688, 703.)

The arguments presented by North Fork and the state defendants rooted in concepts of "executive" authority and "legislative" acts are not especially useful in view of the Supreme Court's use of a flexible, nonformalistic approach. (*United Auburn*, *supra*, 10 Cal.5th at p. 558.) The court stated: "Rather than attempt to characterize the

18.

Governor's concurrence power as a wholly legislative or executive one, we construe the power as containing features that cut across both categories." (*Id*. at p. 559.)

Accordingly, we reject the state defendants' formalistic argument that the Governor's concurrence is an executive act and, as such, is not subject to referendum. (See *Pacific Rock & Gravel Co. v. City of Upland* (1967) 67 Cal.2d 666, 669 [executive or administrative acts are not subject to the power of referendum].) The power to concur contains features that are both legislative and executive in nature. (See *United Auburn*, *supra*, 10 Cal.5th at p. 559 [concurrence power is not wholly legislative or executive; it is construed "as containing features that cut across both categories"].) This combination of legislative and executive functions is why section 1 of article V of the California Constitution, which vests "supreme executive power" in the Governor, does not compel a conclusion that the people possess no authority to revoke a concurrence or, alternatively, a referendum is not the appropriate mechanism for exercising the people's authority to annul a concurrence.

The power of referendum is "the power of the electors to approve or reject statutes or parts of statutes." (Cal. Const., art. II, § 9, subd. (a).) We interpret the Constitution's phrase "statutes or parts of statutes" as referring to legislative actions. This interpretation is based on the principle that reasonable doubts about the referendum power should be resolved in favor of its use. (See *Associated Home Builders etc., Inc. v. City of Livermore*, *supra*, 18 Cal.3d at p. 591.) When the Governor issues a concurrence in the Interior Secretary's two-part determination, the power being exercised is not wholly legislative or executive, but cuts across both categories. (*United Auburn*, *supra*, 10 Cal.5th at p. 559.) The legislative aspect of a concurrence renders it subject to the power of referendum and the constitutional provisions stating the supreme executive power is vested in the Governor does not insulate a concurrence from the reach of a referendum. (See Cal. Const., art. V, § 1 [executive power].) Thus, we conclude a referendum is an

appropriate mechanism for annulling a Governor's concurrence in the Interior Secretary's two-part determination.

### 3. Implied Annulment

In this case, plaintiffs contend Proposition 48 invalidated the Governor's concurrence. The official title and summary for Proposition 48, which were prepared by the Attorney General, do not expressly reference the concurrence power or the Governor's concurrence for the Madera site. Consequently, the facts of this case raise a third issue of constitutional law—specifically, whether the people may *impliedly* annul the Governor's concurrence.

In *Youngstown*, *supra*, 343 U.S. 579, the concurring opinion of Justice Jackson stated:

> "When the President takes measures incompatible with the *expressed or implied will* of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive presidential control in such a case only by disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution for what is at stake is the equilibrium established by our constitutional system." (*Id*. at pp. 637-638, italics added.)

This statement about the relationship between the powers of the executive and the will of the legislative body does not translate directly to the present case. Here, however, we are not concerned with the relationship between two branches of government, but the relationship between the state's executive officer and the people. Identifying the equilibrium established by our state constitution in that relationship must reflect the fundamental principle that all political power is derived from the people. (Cal. Const., art. II, §1; see *McClatchy Newspapers v. Superior Court*, *supra*, 44 Cal.3d at p. 1184.) Based on this constitutional principle about power, and our Supreme Court's reliance on Justice Jackson's reference to the implied will of Congress, we conclude the people may

20.

impliedly express their will to annul a concurrence issued by the Governor. Where a constitutional power is implicit—that is, has been impliedly granted by the people to the Governor—an appropriate balance is struck by recognizing the people may impliedly annul an exercise of that power. In other words, by parity of reasoning, that which the people granted by implication can be annulled by implication.

### 4. Proposition 48

Based on the foregoing legal conclusions about the people's power and the use of referenda, we consider whether Proposition 48 is properly interpreted as an exercise of the people's authority to annul the Governor's August 30, 2012 concurrence.

Plaintiffs contend "the State's electorate explicitly rejected the off-reservation casino at issue here" by voting on Proposition 48, which provided clear evidence of legislative disapproval of the Governor's exercise of the concurrence power for the Madera site. Plaintiffs characterize the vote on Proposition 48 as a veto of all the Governor's actions related to the compact with North Fork.

In contrast, the state defendants argue Proposition 48 did not eliminate the Governor's previous concurrence or the Governor's power to concur. North Fork also contends Proposition 48 did not "purport to restrict the Governor's concurrence power." North Fork further asserts there is no authority supporting plaintiff's contention that a voter referendum addressing a distinct legislative act can impliedly revoke a concurrence issued by the Governor. Under North Fork's view, Proposition 48 addressed the compact-ratifying statute, kept it from coming into effect, and did not pertain to the concurrence, which is entirely separate from the negotiation, execution and ratification of a compact.

Initially, we consider who drafted Proposition 48. While not decisive, the fact by the official title and summary was prepared by the Attorney General's Office, which is representing the state defendants, supports applying the general principle that reasonably

doubts should be resolved in favor of the use of the referendum power. (See *Associated Home Builders etc., Inc. v. City of Livermore*, *supra*, 18 Cal.3d at p. 591.)

Our analysis of the voter's intent in rejecting Proposition 48 also includes the consideration of the consequences that flow from the competing interpretations of Proposition 48. (Cf. *Zieve, Brodnax & Steele, LLP v. Dhindsa* (2020) 49 Cal.App.5th 27, 35 [when construing statutory language, courts consider the consequence that will flow from a particular interpretation].) We adopt this approach to interpreting referenda because it is unrealistic to adopt an approach holding the people vote on a referendum without considering the consequences of their vote.

Accordingly, we consider what intent is logically implied by the strict (i.e., literal) interpretation proffered by North Fork and the state defendants. Restricting the voter's rejection of the compact-ratifying statute to the compact itself is the equivalent of inferring the voter's intended to approve the Governor's concurrence. A consequence of this implied approval of the concurrence is that class III gaming would be permitted to occur on the Madera site, but would not be governed by the terms of the compact. Instead, the gaming would be governed by secretarial procedures. (See 25 U.S.C. § 2710(d)(7)(B)(vii) [after mediation, Secretary shall prescribe procedures for the conduct of the class III gaming that are consistent with the proposed compact selected by the mediator].) In this case, those procedures had yet to be adopted when Proposition 48 was rejected in November 2014. Instead, the secretarial procedures were put in place in July 2016. Accordingly, the approach of North Fork and the state defendants treats the voters as rejecting the tribal-state compact negotiated by the Governor and favoring the secretarial procedures that would be subsequently created and imposed by the federal government pursuant to IGRA. The probability of this approach accurately identifying the people's will is, in our view, extremely low.

22.

In comparison, the voter's rejection of the compact-ratifying statute is reasonably interpreted as an expression of their intent to reject class III gaming on the 305-acre Madera site taken into trust in February 2013. This rejection of class III gaming at the Madera site implies the voters disapproved the Governor's concurrence in the Interior Secretary's two-part determination because that concurrence is one of IGRA's conditions that must be satisfied for class III gaming to be allowed at the site. (See 25 U.S.C. § 2719(b)(1)(A).) Therefore, we conclude the people's rejection of Proposition 48 impliedly expressed their will to annul the Governor's August 30, 2012 concurrence for the Madera site. As a result, the demurrers of North Fork and the state defendants should have been overruled.

## DISPOSITION

The judgment is reversed and matter is remanded for further proceedings. The trial court is directed to vacate its order sustaining the demurrers and enter a new order overruling them. Appellants are awarded costs on appeal.

SMITH, J.

WE CONCUR:

DETJEN, Acting P.J.

FRANSON, J.

23.